EXECUTIVE BUILDERS, INC., An Indiana Corporation, and Robert L. Montgomery, and Dolores Montgomery, Appellants–Plaintiffs,

v.

G. Raymond TRISLER, Appellee–Defendant.

No. 73A01–0001–CV–30.

Court of Appeals of Indiana.

Dec. 6, 2000.

John D. Raikos, Indianapolis, Indiana, Attorney for Appellants.

Michael E. Simmons, Hume Smith Geddes Green & Simmons, Indianapolis, Indiana, Attorney for Appellee.

## OPINION

BAKER, Judge

This cause of action was born in 1987 and comes before us once again. *See Trisler v. Executive Builders, Inc.*, 647 N.E.2d 390 (Ind.Ct.App.1995), *trans. denied.* Appellants-plaintiffs and counter-defendants Executive Builders, Inc. (Executive Builders), Robert L. Montgomery and Dolores Montgomery (collectively referred to as "Executive") appeal the judgment entered in favor of appellee-defendant and counter-plaintiff G. Raymond Trisler. Specifically, Executive maintains that the judgment awarding Trisler $178,240 in compensatory

damages and $1.64 million in punitive damages must be set aside because: 1) the trial court erred in refusing Executive's request to amend the pleadings to conform to the evidence; 2) the issue of "probable cause" with respect to Trisler's counterclaim for malicious prosecution should not have been presented to the jury; 3) the trial court did not respond adequately to inquiries that were made by the jury; 4) the trial court improperly read an instruction to the jury indicating that Trisler had prevailed on his complaint against Executive for interference; 5) the courtroom environment was substandard; 6) the trial court should have directed a verdict in favor of Executive, inasmuch as the evidence was not sufficient to support a verdict in Trisler's favor; and 7) the punitive damage award may not stand because it was based solely upon the jury's prejudice and passion. *See* Appellant's Brief at ii.

### FACTS

The facts most favorable to the verdict are that Executive Builders, which was owned by Robert and Dolores Montgomery and a number of other individuals, purchased some real property in Greenwood in a development area known as Cielo Vista. The plan was to subdivide the property into sixty-lot units of condominium housing. While the estimated value of the land was approximately $900,000, Executive paid a purchase price of $310,000 for its lots. Trisler owned and rented three of the seventeen units that had already been sold. In 1985, he moved to an adjoining subdivision but continued to rent his Cielo Vista units.

At one point, Dolores took it upon herself to amend certain Homeowner's Association (Association) documents in the subdivision to "properly reflect" the corporate status "as viewed by Executive Builders." *Trisler,* 647 N.E.2d at 391. Prior to Dolores's actions, Trisler had attempted to revive the Association by having another homeowner in the subdivision file an annual corporate report with the Indiana Secretary of State. In response, Executive appointed and/or elected a "purported" new Board of Directors and Officers for the Association. *Id.* Robert served as the self-appointed chairman of the Association. Dolores and other members of Executive were designated to serve three-year terms on the Association's Board of Directors. Record at 3429.

In May 1986, the Association placed a "special assessment" against the original seventeen unit owners, purportedly for repairs to the property. Approximately one year later, the Association attempted to place liens against the units on the basis of unpaid regular monthly assessments for the period between 1980 and 1985.

Trouble began to brew with respect to the levying of such "assessments" and Trisler, who believed that the charges brought by the Association were improper, consulted with legal counsel. Thereafter, Trisler maintained that the Board of Directors had been improperly appointed and that Executive owed the Association "thousands of dollars." R. at 2476.

In response, Robert immediately began accusing Trisler of wrongdoing. For instance, Robert sent a letter to all homeowners indicating that Trisler was desiring to "keep him and his friends in the rental property business and to protect their investments at your expense." R. at 3163–64. Robert sent additional correspondence to the property owners alleging that Trisler "would just as soon turn this community into a slum rental project." R. at 2863. After Robert discovered that his written correspondence had not produced any favorable result to him, he filed a complaint in the trial court on December 11, 1987, against Trisler, alleging "Intentional Interference with Business." R. at 51. The allegations asserted that Trisler had advised the homeowners in the development to withhold payment of their monthly fees and that he interfered with the Association "on an ongoing basis." R. at 59. Executive also maintained that Trisler utilized attorneys to create artificial legal obsta-

cles, such as challenging the validity of all meetings of the Association and generally impeding the progress of Executive. R. at 59. Moreover, Executive asserted that Trisler deterred potential customers from making purchases of the condominium properties and maintained that Trisler's actions were done with the willful intent to injure and damage Executive which entitled it to punitive damages. R. at 63.

Trisler denied all allegations and proceeded to file a counterclaim against Executive Builders along with a third-party seven-count complaint against Robert and Dolores. Trisler sought damages for defamation, invasion of privacy, abuse of process and frivolous litigation. The trial court eventually entered summary judgment in favor of Trisler upon the complaint for business interference that Executive had filed against him.

Robert and Dolores continued their attack on Trisler. On February 7, 1988, the purported minutes of the annual meeting of the Association, held on June 14, 1987, were typed and distributed to the homeowners. Dolores was responsible for the contents of all such newsletters to the homeowners. R. at 2280. That newsletter cast Trisler in a derogatory and unfavorable light. R. at 2852–56.

Although summary judgment for Trisler was entered on February 21, 1990, the trial court vacated its order on March 31, 1994, in accordance with Executive's request. Trisler then appealed that order to this court, where we reversed the trial court and remanded the cause with instructions that the original judgment be reinstated with respect to the interference claim. *Trisler*, 647 N.E.2d at 394.

Following remand, Trisler's counterclaim and third-party complaint against Executive proceeded to trial on June 28, 1999. At the close of all evidence, Executive filed a motion for a directed verdict on the grounds that "Trisler did not, and could not identify any act that was committed individually by Robert ... and/or Dolores." Appellant's brief at 24. The mo-

tions were denied and the jury proceeded to return verdicts in Trisler's favor against Executive Builders in the amount of $143,240, against Robert in the sum of $15,000 and against Dolores for $20,000, for a total judgment award of $178,240. Thereafter, a hearing was held on the issue of punitive damages. During that phase of the trial, it was determined that Robert's assets exceeded $16 million, the assets of Executive Builders was in a negative amount totaling hundreds of thousands of dollars and that Dolores earned an annual income of $15,000. Neither Robert nor Dolores appeared at that juncture of the trial nor offered testimony in rebuttal of the asset values that had been established.

On June 8, 1999, the jury awarded punitive damages against Robert in the amount of $1.64 million and no punitive damages against Executive Builders or Dolores. The following day, Executive requested the trial court to vacate the jury award with respect to the total damage award. These motions were denied on October 18, 1999, and the trial court proceeded to enter judgment in the amount awarded by the jury. Thereafter, the trial court denied Executive's motion to correct error on December 22, 1999. Executive now appeals.

## DISCUSSION AND DECISION

### A. Amendment of Pleadings

■ Executive contends that the trial court erred in refusing its request to amend the pleadings to conform to the evidence. Specifically, Executive claims that it was entitled to assert the affirmative defense of "advice of counsel" following the presentation of the evidence, and further maintains that the trial court erred in refusing to give a final instruction with respect to this defense.

■ In general, the issues of a case are determined, not by the pleadings, but by the evidence produced at trial. *Svetich v. Svetich*, 425 N.E.2d 191, 193 (Ind.Ct.

App.1981). For an issue not raised by the pleadings to be litigated by implied consent, thereby permitting an amendment of the pleadings to conform to the evidence presented at trial, both parties must know that the issue was being presented. *See Dotlich v. Dotlich,* 475 N.E.2d 331, 349–50 (Ind.Ct.App.1985), *trans. denied.* With respect to the defense pertaining to advice of counsel, the appellant must show, by a preponderance of the evidence, that he acted in good faith and fully and truthfully made known to legal counsel all facts within his knowledge, or which could have been ascertained by the exercise of due diligence. *F.W. Woolworth Co. v. Anderson,* 471 N.E.2d 1249, 1255 (Ind.Ct.App.1984), *trans. denied.* Additionally, one who desires to assert "advice of counsel" as a defense must also establish that such counsel was competent and disinterested. This showing is an essential prerequisite to the invocation of the defense. *Id.*

Here, Executive's counsel requested the trial court to give the following instruction which contained a portion of the language of Ind. Trial Rule 11(A):

> The signature of an attorney constitutes a certificate by him that he has read the pleadings; that to the best of his knowledge, information, and belief, there is good ground to support it; and that it is not interposed for delay.... For a willful violation of this rule an attorney may be subjected to appropriate disciplinary action.

Such an instruction was requested after testimony at trial indicated that Executive acted on advice of its counsel in pursuing the cause of action against Trisler. In refusing the instruction, the trial judge commented that:

> I will deny the Motion to Have the Pleadings Conform to the Evidence; however, there was evidence that, the Montgomerys testified that ... the suit was filed after consultation with Mr. Thomas. So Mr. Raikos you may argue to the Jury that your clients caused the lawsuit to be filed after consulting with

their attorney, but I'm not gonna give an Instruction that would advise the Jury that advice of counsel is an absolute defense because it was not pled affirmatively as I believe the Trial Rules require.

R. at 3763. Here, the record is devoid of testimony directly addressing the issue of advice of counsel as well as the extent of the information that was transmitted by Executive to its attorney. The evidence simply demonstrated that Executive had consulted with an attorney who then signed the interference complaint. Moreover, if Executive desired to rely upon the defense of "advice of counsel," Trisler could have delved into the accuracy and totality of the information provided to the attorneys by Executive at trial, as compared to the allegations actually contained in the interference complaint which were subsequently shown to be false. Moreover, documentary evidence including memoranda, diaries or summaries provided to counsel may have been subject to discovery in order to verify the information that Executive had transmitted to counsel. Finally, Executive set forth no evidence establishing the competency of any of the attorneys who represented it during the course of the twelve-year litigation. As a result, Executive's request to amend the pleadings to conform to the evidence was correctly denied by the trial court for failure to present evidence of all necessary elements of the purported defense of advice of counsel. *See F.W. Woolworth Co.,* 471 N.E.2d at 1255. Thus, the instruction as to this issue was also properly denied.

### B. Probable Cause and Malicious Prosecution

■ Executive next urges that the issue of "probable cause" regarding the malicious prosecution claim should not have been submitted to the jury. Specifically, it contends that the existence of probable cause is purely a question of law and the trial court, rather than the jury, was obli-

gated to determine its existence or nonexistence.

 To resolve this issue, we note that to support a claim for malicious prosecution, the plaintiff must show the occurrence of legal action instituted by the defendant with malice and the absence of probable cause. *Costello v. Mut. Hosp. Ins. Inc.*, 441 N.E.2d 506, 508 (Ind.Ct.App. 1982). The plaintiff must also demonstrate that the litigation terminated in the plaintiff's favor and that damages resulted. *Id.* The determination of probable cause is normally an issue of fact for the jury's determination. When the facts are undisputed, however, probable cause is for the court to decide as a matter of law. *Id.*

In the instant case, it is readily apparent from the record that the facts Executive alleged in the interference complaint with regard to Trisler's alleged conduct are quite different from those that were presented by the testimony at trial. Inasmuch as the facts were disputed by the parties, the trial court did not err in permitting the jury to determine the issue of probable cause with respect to Trisler's claim for malicious prosecution.

### C. Response to Jury Questions

 Executive claims that it was denied a fair trial when the trial judge refused to provide the jury with a copy of the twenty-two final instructions that were read to it. Moreover, Executive maintains entitlement to reversal because the trial judge erred in not clarifying certain portions of the instructions during deliberations.

 We note that the trial court's failure to answer the jury's questions during deliberation is not error *per se*, and the trial court must exercise discretion in determining whether certain inquiries of the jury should be answered. *Bituminous Fire & Marine Ins. Co. v. Culligan Fyr-*

*protexion, Inc.*, 437 N.E.2d 1360, 1364 (Ind.Ct.App.1982). In criminal cases, our supreme court has determined that the generally accepted procedure in answering a jury's question on a matter of law is for the trial court to *re-read* all the instructions and not to qualify, modify, or explain its instructions in any way. *Riley v. State*, 711 N.E.2d 489, 492 (Ind.1999).

A panel of this court has determined that the practice of providing copies of the jury instructions to the jury is not recommended. *See Taylor v. Monroe County*, 423 N.E.2d 699, 701 (Ind.Ct.App.1981). We note, however, that favorable results have been reached when written or taped instructions are provided to the jurors during deliberations. Amer. Bar Ass'n. Comm. on Jury Standards, *Standards Relating to Juror Use and Management*, 148 (rev. ed.1993) (commenting on Standard 16(c)(ii)). Such a practice aids juror comprehension, and the ABA standards specifically call for such a procedure of making the instructions available to the jury during deliberations. *Id.*[1] It has also been suggested that the effect of sending the instructions to the jury room may: a) increase juror confidence in their verdict, b) reduce deliberation time, and c) reduce the likelihood of disputes among jurors regarding the content and application of instructions. G. Thomas Munsterman, Paula Hannaford & G. Marc Whitehead, *Jury Trial Innovations* (1998 ed.). The Judicial Administration Committee of the Indiana Judicial Conference has also spoken on this issue and has recommended that final instructions should be provided to each juror during deliberations. Reports of the Citizens Comm'n for the Future of Indiana Courts and the Judicial Administration Committee of the Indiana Judicial Conference, *Juries for the 21st Century*, Vol. I, at 78 (2000).

---

1. While such a practice may be acceptable, it is also imperative that if the instructions go back to the jury, they must be on a "clean" copy without indicating which of the parties may have submitted the instructions for the court's inclusion. See *Rozika v. State*, 520 N.E.2d 1267, 1270 (Ind.1988).

In this case, the trial judge responded to the jury's questions by sending a note to them indicating that "All I can do is re-read the instructions." R. at 1583. While we believe that the preferred method would have been for the trial judge to have sent copies of the instructions to the jury room in accordance with the commentaries discussed above, we do not condemn his response to the questions made in accordance with our decision in *Taylor.* Thus, in light of our decision today, we find it acceptable for a trial judge to either re-read the instructions as suggested in *Taylor,* or to send unmarked copies of them to the jury room. Thus, in this case, there was no error.

### D. Jury Instruction as to Interference Claim

Executive claims that the trial court erred in instructing the jury that the Interference action it filed was ultimately decided in Trisler's favor. Specifically, it maintains that the instruction erroneously provided that the "issues on the merits" with respect to this issue had been decided. Appellant's brief at 20.

The portions of the instruction of which Executive complains provide that:

The claim filed by Executive Builders, Inc. was ultimately resolved in favor of Ray Trisler and against Executive Builders, Inc. by decision of the Court of Appeals of Indiana on March 8, 1995. The remaining issues for your consideration are G. Ray Trisler's claims against Executive Builders, Inc. for abuse of civil process, wrongful intimidation, breach of fiduciary duties with respect· to entrusted properties, intentional misconduct, malicious prosecution.

Also remaining for your consideration are G. Ray Trisler's claims against Robert and Dolores Montgomery for abuse of civil process, wrongful intimidation, wrongful deception and/or mischief, breach of fiduciary duties with respect to entrusted properties, intentional misconduct, invasion of privacy, malicious prosecution and against Robert Montgomery for defamation.

R. at 1556–57.

We initially observe that Executive did not raise any objection to the above-quoted preliminary or final jury instruction at trial. Thus, the issue is waived. *Lewis v. Davis,* 410 N.E.2d 1363, 1368 (Ind.Ct.App. 1980). Waiver notwithstanding, we note that Trisler submitted evidence in an effort to establish his claim to summary judgment, and Executive proffered no evidence to the contrary. Moreover, Executive's failure to then timely file an appeal from that summary judgment order does not negate the result that the complaint for Interference was terminated in Trisler's favor on the merits. Thus, Executive's argument that this cause was "erroneously presented to the jury" must fail. *See* Appellant's brief at 34.

### E. Environment of the Courtroom

Executive next claims that it was denied a fair trial because of the substandard conditions of the courtroom. Specifically, Executive contends that a new trial is warranted because of the existence of poor acoustics and the amount of "diffused sunlight" that was shining in counsel's face throughout the trial. Appellant's brief at 47.

We note that counsel for Executive voiced no complaints of such alleged "substandard" conditions during trial. The trial judge also addressed the jury at the onset of the case that traffic noise could be a problem and instructed jury members to raise their hand in the event anyone had difficulty hearing the testimony. R. at 1776. At no time during the trial did any juror express difficulty in hearing the proceedings, nor did anyone else in the courtroom so indicate. Finally, we note that Executive has not made any claims that it was prejudiced by such conditions. Thus, there was no error.

### F. Sufficiency of the Evidence

Executive next contends that the evidence was insufficient to support the

jury's verdict. Specifically, it maintains that the record reveals that the claims Trisler brought against Executive Builders, Robert, and Dolores merely showed a "churning" of attorney fees and an unwarranted request for punitive damages. *See* Appellant's brief at 19.

We initially observe that we will neither reweigh the evidence nor judge the credibility of witnesses. *F.W. Woolworth Co.*, 471 N.E.2d at 1253. Rather, we will consider only the evidence most favorable to the judgment along with all reasonable inferences which may be drawn from that evidence. *Id.* Only in those instances where the evidence points to a single conclusion different from the one reached by the trial court may we reverse on grounds of insufficient evidence. *Id.* While a verdict may be overturned if it is legally or logically inconsistent, contradictory or repugnant, this court indulges in every reasonable presumption in favor of legality of the jury's verdict. *Emerson v. Markle*, 539 N.E.2d 35, 39 (Ind.Ct.App. 1989), *trans. denied.*

As set forth in the *FACTS*, Trisler's counterclaim and third-party complaint filed against Executive sought damages for defamation, invasion of privacy, abuse of process and frivolous litigation with respect to Executive's complaint for interference. R. at 517–31. From the evidence presented at trial, it is apparent that Robert issued a number of false statements in the complaint against Trisler. Even more compelling, the evidence reveals that the true purpose of Executive's causes of action against Trisler was to use the litigation as a sham for asserting false and malicious allegations against him for the purpose of damaging Trisler's integrity and reputation.

Even at trial, Robert answered "you bet" when asked whether he had filed the complaint against Trisler to "shut him up." R. at 2850. The evidence revealed that none of the individuals that Robert had identified as those who decided not to purchase a residence in the subdivision from Trisler had even heard of Trisler. R. at 1981–82, 2203. Rather, it was demonstrated that one of the prospective purchasers had retracted his offer when Dolores refused to make good on her promise to perform repairs on one of the units. R. at 1979–81, 1995–96. Moreover, potential buyers named in several of the discovery documents did not even exist until *after* Executive's complaint had been filed. At least one witness testified that he was unaware of anyone who did not purchase the property at Cielo Vista because of Trisler's alleged wrongdoings. R. at 2163–64.

Additionally, while Robert claimed that Trisler had assaulted him in 1985 by "jabbing him with his forefinger," the evidence at trial showed that this incident never occurred. R. at 3154. A number of other allegations regarding Trisler's "wrongdoings" that Executive alleged in the interference complaint were also shown to be false. R. at 1967–71. An incident demonstrating intimidation included Robert's pounding on Trisler's front door at 5:30 a.m. on one occasion. R. at 3165, 3261–62, 3546. Further, Dolores falsely reported to the Board of Directors of the Association that Trisler had stolen property and referred to Trisler in her deposition as "slime" and "disease." R. at 2992.

In reviewing the evidence that was presented at trial, it is apparent that Robert and Dolores engaged in a personal crusade throughout the pendency of this action which was designed to intentionally and maliciously destroy Trisler's reputation and peace of mind. The evidence overwhelmingly demonstrated that Robert and Dolores acted maliciously toward Trisler. Thus, we decline to disturb the jury's verdict.

### G. *Punitive Damages*

Robert next claims that the award of punitive damages was erroneous. Specifically, Robert argues that the judgment may not stand because there was no showing that his actions were malicious, oppres-

sive and intentional. Moreover, Robert maintains that the award violated his rights to due process under the United States Constitution and Indiana Constitution in that the amount awarded was impermissibly excessive.

■ To resolve this issue, we initially observe that the standard of review for punitive damages is whether, considering only the probative evidence and the reasonable inferences supporting the judgment, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find by clear and convincing evidence that the defendant acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing. *Budget Car Sales v. Stott,* 662 N.E.2d 638, 639 (Ind.1996), *trans. denied.*

■ We also note that a judgment that is a product of fair procedures is cloaked with a strong presumption of validity. *Coachmen Indus. Inc. v. Dunn,* 719 N.E.2d 1271, 1278 (Ind.Ct.App.1999), *trans. denied.* Particularly, where impartial jurors were selected; the jurors heard all the evidence presented by both sides; the trial court properly instructed the jury on the law; and the trial court upheld the punitive award after considering its constitutionality, there is a presumption that the award is constitutional. *Id.*

■ Finally, we note that when reviewing the amount of punitive damages that are awarded, the following guideposts are used to determine whether an award is grossly excessive: 1) the degree of reprehensibility of the conduct at issue; 2) the disparity between the harm or potential harm suffered by the complaining party and the punitive damages the complaining party received; and 3) the difference between the punitive damages remedy and the civil penalties authorized or imposed in comparable cases. *Ford Motor Co. v. Ammerman,* 705 N.E.2d 539, 561–62 (Ind.Ct.

App.1999), *trans. denied.* Each case must be analyzed on its own facts, considering the guideposts set forth above, as well as other factors. *Coachmen,* 719 N.E.2d at 1278. Moreover, the economic wealth of the defendant should be considered when determining the amount of punitive damages that should be awarded. *Ammerman,* 705 N.E.2d at 563. Economic wealth considerations are necessary based upon the theory that it will take a greater penalty to dissuade the rich than the poor from engaging in oppressive conduct. *Ramada Hotel Operating Co. v. Shaffer,* 576 N.E.2d 1264, 1268 (Ind.Ct.App.1991).

Contrary to Robert's challenge to the constitutionality of the punitive damages award, the record reflects that impartial jurors were selected to hear the cause; the jurors heard all the evidence; the trial court properly instructed the jury; and the trial court considered Robert's argument of unconstitutionality in its motion to correct error, which it denied. Thus, the award is presumed to be constitutionally valid. *See Coachmen,* 719 N.E.2d at 1278.

■ In the instant case, Trisler testified that Executive's cause of action resulted in nearly six years of sleeplessness, mental anguish, depression and nervousness. R. at 3531. Trisler was frightened by Robert's actions and he believed that his neighbors and co-owners placed blame on him for the dispute that the Montgomerys had publicized. As set forth above, the evidence at trial demonstrated that Robert purposely and maliciously orchestrated and financed a false and frivolous cause of action against Trisler. Robert also conducted other public attacks on Trisler in an effort to ruin Trisler's reputation and standing within his own community and neighborhood. As a result, we cannot say that the award of punitive damages was error.

■ With respect to the amount of punitive damages that were awarded, we note that the ratio of those damages to compensatory damages was approximately

nine to one. Contrary to Executive's claim, such an award is not error. In *Emerson v. Markle*, 539 N.E.2d at 40–41, we determined that a punitive damage award which was 150 times larger than the actual damage award was not excessive. Just as the facts show here, the *Emerson* case involved a personal crusade on the part of the defendant which was designed to intentionally and maliciously destroy an individual's reputation, peace of mind, and career. *Id.* at 40. Here, the jury heard evidence that Robert's economic wealth amounted to at least $16 million. The punitive damage award was approximately ten percent of that amount. Thus, it can hardly be said that leaving Robert with 90% of his wealth is oppressive in light of his conduct and attempts to destroy Trisler in a number of ways. An award of a lesser amount may well have been insufficient to punish Robert for his conduct and to deter him and others from engaging in such conduct in the future.

Finally, we reject Robert's argument that the amount of punitive damages awarded should be limited to three times the compensatory damages or $50,000, whichever is greater, in accordance with IND.CODE § 34-51-3-4. This statute, which became effective on July 1, 1998, does not apply to this cause, inasmuch as the litigation commenced in 1987, prior to its enactment. The legislature did not see fit to make this statute retroactive. Therefore, Trisler's recovery is not limited under the provisions of this statute.

## CONCLUSION

In light of our disposition of the issues set forth above, we conclude that the trial court properly denied Executive's request to amend its pleadings to conform to the evidence. Additionally, the issue of probable cause regarding the malicious prosecution claim was properly submitted to the jury, and the trial court properly addressed the questions posed by the jury during trial. Moreover, the jury was correctly instructed with respect to Execu-

tive's claim against Trisler for interference, and Executive may not succeed on its claim that it was entitled to a new trial because of the purported substandard conditions of the court room. Finally, we conclude that sufficient evidence was presented to support the award of compensatory and punitive damages in favor of Trisler.

Judgment affirmed.

BAILEY and VAIDIK, JJ., concur.