**Brenda S. BAILEY, Individually and as Administratrix of the Estate of Billy Ray Bailey, Deceased, Appellant–Plaintiff,**

**v.**

**Gary A. SPAIN and Northern Indiana Public Service Company, and Patricia Smolen, Appellees–Defendants.**

No. 46A03–0102–CV–40.

Court of Appeals of Indiana.

Dec. 26, 2001.

---

Donald W. Pagos, Michigan City, IN, Attorney for Appellant.

Robert M. Green, Merrillville, IN, Attorney for Appellee Patricia Smolen.

Paul A. Rake, Robert J. Feldt, Alyssa Stamatakos, Eichhorn & Eichhorn, Hammond, IN, Attorneys for Appellees Gary A. Spain and Northern Indiana Public Service Company.

## OPINION

BAKER, Judge.

Appellant-plaintiff Brenda S. Bailey (Brenda) appeals the jury's verdict in favor of appellees-defendants Gary A. Spain, the Northern Indiana Public Service Company (NIPSCO), and Patricia Smolen. The verdict was entered on her claim for the wrongful death of her husband Billy Ray Bailey (Billy Ray). Specifically, Brenda contends that the jury's verdict in favor of the defendants was contrary to law. Brenda further argues that the trial court erred in instructing the jury on comparative fault and provided inappropriate verdict forms.

## FACTS

The facts most favorable to the verdict are that on November 3, 1994, Smolen was driving south on U.S. 421. As she approached the intersection of U.S. 421 and County Road 2100 South, she suddenly lost control of her car. Smolen's car crossed the center lane of U.S. 421, hit a NIPSCO utility pole, flew in the air, flipped over, and landed in a watery ditch. The car landed on the driver's side in the ditch. Smolen does not know why her vehicle left the road, and she has no memory of the event.

The impact of Smolen's car broke the utility pole, moving the pole five or six feet

off its base. Two live wires, each carrying 7200 volts of electricity, hung down to the ground from the broken pole. The broken pole itself remained upright, suspended only by the tension of the remaining wires. Thomas Brindley, who saw the accident as he approached from the north bound lane of U.S. 421, pulled his semi-tractor to the side of the road. Brindley saw gas leaking from the car's gas tank into the ditch, and he witnessed sparks from the live wires igniting grass near the utility pole.

At approximately the same time, Terri Lukac, driving south on U.S. 421, arrived at the accident scene. She also noticed sparks from the wires and the grass nearby the wires burning. Shortly thereafter, John Sheely happened on the accident scene. Sheely got out of his vehicle and told Lukac to stand back from the intersection. He then pulled some gloves from the back of his truck, put them on, and grabbed the live wires. He was immediately electrocuted and collapsed to the ground where the live wires fell atop him. Sheely ultimately died as a result of the electrocution.

Within a few moments of Sheely's electrocution, Billy Ray and his brother arrived at the scene. The two had just ended their shifts at Ford Motor Company and were traveling to their homes in Billy Ray's truck. Billy Ray and his brother began directing traffic on U.S. 421. Billy Ray had experience directing traffic as a former member of the Starke County Sheriff's Posse.

By happenstance, two NIPSCO linemen, Gary Spain and Donald Gibson, approached the intersection from the south in two separate vehicles. Spain was driving a "bucket truck," while Gibson was driving a "digger truck."[1] The two had been replacing a broken utility pole in North Judson approximately seven miles south of the accident and were on their way to a NIPSCO garage. Two of their co-workers, Robert Homey and Steve Collins, had remained at the original North Judson site to finish other repairs.

Spain immediately notified NIPSCO's dispatcher over his truck radio that another pole was down and that someone was under the downed wires. Gibson, meanwhile, grabbed his hardhat and gloves and retrieved an insulated fiberglass "switch stick" from Spain's truck. A "switch stick" is normally used to open and close electrical switches. Tr. at 336. Gibson used the switch stick, with the help of one other bystander, to pull Sheely out from beneath the live wires. After pulling out Sheely, Gibson warned other bystanders to keep clear of the wires and also checked on Smolen's condition. After ascertaining that Smolen was conscious, Gibson used the Switch stick to control the live wires. While Gibson was extricating Sheely and controlling the live wires, Spain began trying to de-energize the live wires. He used a long stick to open a fuse to the west to stop the electrical feed of current from that direction.

However, there was still electricity flowing along U.S. 421. Spain radioed NIPSCO's dispatch to determine the location of the switch to the north. Spain's supervisor told him by radio that there was a feed just to the north of the intersection. After driving to that switch, Spain confirmed that both switches on the circuit were open. This meant that, although the wires Gibson was controlling at the accident scene were still live, no power was

---

1. Spain testified that a "bucket truck" was used for "aerial work," which included hanging transformers, repairing power lines, or extending power lines. Tr. at 879. He also testified that a "digger truck" was used for installing utility poles in the ground. Tr. at 879.

originating from north of the intersection of U.S. 421 and County Road 2100. Spain then returned to the scene and parked his truck in a nearby vacant lot on County Road 2100 to await further instructions from dispatch. Spain's co-workers—who were still at the North Judson site—overheard the radio communication between Spain and Spain's supervisor. Spain's supervisor instructed these co-workers to open a circuit on U.S. 421 south of the accident scene. Before proceeding, the co-workers had to leave their current job site in a safe condition.

By this time, paramedics and Officer Wilhelm of the Laporte County Sheriff's Department had arrived. Officer Wilhelm noted that all traffic through the intersection had stopped and Billy Ray was no longer directing traffic. Tr. at 155. Instead, Billy Ray had walked over to comfort Lukac, who had witnessed Sheely's electrocution. Tr. at 1135.

Meanwhile, watching the scene from his truck, Spain became increasingly anxious. He knew that gas was leaking, that Gibson was still trying to control the wires, and that people were near the downed wires. Tr. at 901–02. Hearing nothing from his co-workers, who were leaving the North Judson job site, Spain decided to de-energize the wires at the scene. Though it would have been safer for the co-workers to de-energize the wires from a switch south of the scene, Spain concluded that physically cutting the "jumper"[2] at the scene would prevent potential injury to Smolen and others near the downed wires.

Spain drove out of the lot where he had been parked, intending to position the "bucket truck" near the jumper, hoist himself to the jumper by means of the bucket,

and then finally cut the jumper with bolt cutters. He looked south and north and saw no moving traffic in either direction. However, Spain did see Billy Ray, who was about fifteen feet away from Spain at the time, in the middle of the intersection. Spain pointed to the damaged utility pole and motioned to Billy Ray that he was going to back down U.S. 421 so that he could position his truck under the jumper. Billy Ray nodded his head, turned, and ran about thirty or forty yards south on U.S. 421.

Spain began backing his vehicle slowly down U.S. 421. At this time, Lukac noticed that Billy Ray was speaking with two or three men on the west side of the road. She then saw Billy Ray begin to cross the road, walking in a southeasterly direction. However, as Billy Ray began to cross the road, he briefly looked back and waved at the men with whom he had been speaking. When he turned back east, he noticed Spain's truck continuing to back down the road. Billy Ray then turned toward the truck and tried to walk backwards. Then, for some reason, Billy Ray tried to climb onto the back of the bucket truck. His foot slipped, he fell to the ground, and then Spain's truck ran over him, crushing his chest.

Spain, not seeing Billy Ray in either of his mirrors, felt the back end of the truck rise up and then down. Supposing that he had backed into a car, Spain pulled the truck forward and rolled over Billy Ray a second time. This time the bucket truck ran over Billy Ray's upper body, shoulders, and head. Billy Ray died as a result.

On November 1, 1996, Brenda filed her second amended complaint, alleging that Spain, NIPSCO, Smolen, and PRECO, Inc.,[3] negligently caused Billy Ray's death.

---

**2.** At trial, Spain described the "jumpers" as equipment connecting "the wires from the circuit to the wires going across the road." Tr. at 903.

**3.** PRECO manufactured the bucket truck's

Three years later, the trial court granted PRECO's motion for summary judgment. Subsequently, on December 13, 2000, a jury trial began against the remaining defendants, which ended in verdicts in favor of each defendant. Brenda now appeals the judgment entered on the verdicts.

## DISCUSSION AND DECISION

### I. Standard of Review

■ Brenda appeals the judgment entered on the jury's verdict, claiming the verdict was contrary to law. The rule is well established in Indiana that a negative verdict may only be challenged on the grounds that it is contrary to law. *Hinds v. McNair*, 235 Ind. 34, 41, 129 N.E.2d 553, 558 (1955). If the undisputed evidence entitles the one who has the burden of proof to a verdict that has been denied him, such verdict is contrary to law. *Id.*, 129 N.E.2d at 558. To determine this question we may consider only the evidence most favorable to the appellees, together with all reasonable inferences that may be drawn therefrom. *Id.*, 129 N.E.2d at 558–59. On appellate review of jury verdicts, our supreme court further specified:

> "It is only where the evidence is without conflict and can lead to but one conclusion, and the trial court has reached an opposite conclusion, that the decision of the trial court will be set aside on the ground that it is contrary to law."

*Id.*, 129 N.E.2d at 559 (quoting *Pokraka v. Lummus Co.*, 230 Ind. 523, 532, 104 N.E.2d 669, 673 (1952)); *see also* Kenneth M. Stroud, *Indiana Practice: Appellate Procedure* § 12.7 (1990) ("A [negative] judgment will *only* be set aside where the evidence inexorably leads to but one conclusion and the trier of fact has reached another.") (emphasis in original).

back-up alarm. Appellant's App. at 66.

### II. Brenda's Claims

#### A. Jury Verdict Contrary to Law

■ Brenda claims that the jury verdict was contrary to law because the "jury assessed no fault to either of the defendants." Appellant's brief at 6. She then concludes: "That finding was *against the weight of the evidence* and therefore the verdicts were contrary to law." Appellant's brief at 6 (emphasis supplied). We emphasize that appellate review of jury verdicts does not entail reweighing the evidence. On appeal, Brenda was required to show that the evidence was without conflict, could lead to only one conclusion, and the jury reached an opposite conclusion.

■ Brenda failed to make the requisite showing. Under Indiana's Comparative Fault Act, when a party is more than 50% at fault for his own death, "the jury shall return a verdict for the defendants and no further deliberation of the jury is required." IND.CODE § 34–51–2–8(b)(2). It is possible that the jury believed that Smolen, NIPSCO, and Spain were at fault, by some degree, for Billy Ray's injuries, but that Billy Ray was greater than 50% at fault for his own death. The evidence showed that Billy Ray walked from the side of the road toward the bucket truck as the bucket truck slowly backed down the road. Tr. at 1146. He then began walking backward as the truck approached him, before attempting to climb onto the truck and falling on the ground. Tr. at 1147. Based on the evidence presented and the applicable law, we cannot say that the evidence led to only one conclusion, opposite that reached by the jury.

#### B. Incorrect Verdict Forms and Jury Instructions

■ Brenda also alleges that the verdict forms and the jury instruction explaining

the verdict form used by the trial court did not correctly state the law of fault apportionment. She presents this argument for the first time on appeal. When the trial court asked the parties if the verdict forms and accompanying jury instruction were acceptable, trial counsel for Brenda replied: "I don't have any objection, Judge. I think that's—sets it out well enough." Tr. at 1216. According to our trial rules, "No party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Ind.Trial Rule 51(C); *see also Executive Builders v. Trisler,* 741 N.E.2d 351, 358 (Ind.Ct.App.2000) ("Executive did not raise any objection to the ... preliminary or final jury instruction at trial. Thus, the issue is waived."), *trans. denied,* (Ind. July 18, 2001), *petition for cert. filed,* (U.S. Oct. 15, 2001) (No. 01–663). Therefore, Brenda has waived her argument that the verdict forms and accompanying jury instruction were erroneous.

■ Brenda also complains for the first time that the instruction defining contributory negligence did not clearly explain that some contributory negligence on Billy Ray's part was not a complete bar to the claim. Appellant's brief at 14. At trial, when given an opportunity to object to the contributory negligence instruction, trial counsel for Brenda responded:

> Judge, this is—this is becoming repetitive now. They've already request—and it's covered by other instructions. I mean everyone—the jury's gonna know what he's doing and you're—you're gonna define negligence, you're gonna define comparative—comparative fault and preponderance of the evidence and proximate cause. This is now trying to give another instruction specifically about his failure to use reasonable care.

Tr. at 1215. In short, Brenda objected to the contributory negligence instruction because it was repetitive. Because Brenda now presents a different objection to this court than she argued to the trial court, she has waived her argument. *See Mitchell v. State,* 742 N.E.2d 953, 955 (Ind.2001) (determining that defendant waived appellate review of a jury instruction because, among other reasons, he had asserted an argument on appeal different from that raised at trial).

Judgment affirmed.

FRIEDLANDER, J., and ROBB, J., concur.