**Anita INLOW, Appellant–Defendant,**

v.

**Michael A. WILKERSON,**
**Appellee–Plaintiff.**

No. 49A02–0110–CV–689.

Court of Appeals of Indiana.

May 17, 2002.

Publication Ordered June 26, 2002.

Jack G. Hittle, Martin E. Risacher, Church, Church, Hittle & Antrim, Noblesville, IN, Attorneys for Appellant.

Stan B. Hirsch, Indianapolis, IN, Attorney for Appellee.

BAILEY, Judge.

## Case Summary

Appellant–Defendant Anita Inlow ("Inlow") appeals following the jury's award to Appellee–Plaintiff Michael Wilkerson ("Wilkerson") of $3,500.00 on his claim for wrongful interment of human remains, $250,000.00 on his claim for intentional infliction of emotional distress and $500,000.00 as punitive damages. We reverse.

## Issues

Inlow presents three issues for review:

I.  Whether the evidence is sufficient to support the verdict on wrongful interment;

II. Whether the evidence is sufficient to support the verdict on intentional infliction of emotional distress; and

III. Whether the evidence is sufficient to support the award of punitive damages.

## Facts and Procedural History

Wilkerson and Carryl Inlow ("Carryl") married on September 4, 1982. In 1984, their child R.W. was born. In May 1994, Carryl learned that she was suffering from a brain tumor and underwent brain surgery. She was ultimately diagnosed as terminally ill, suffering from breast and brain cancers.

During January 1997, Wilkerson decided to accept an employment transfer to Pontiac, Michigan. On January 21, 1997, in anticipation of placing Carryl in a nursing home, Wilkerson petitioned for guardianship of Carryl. When Carryl received her summons and thereby learned of the guardianship petition, she contacted her brother Lawrence Inlow ("Lawrence"). On February 6, Carryl petitioned for legal separation from Wilkerson. Carryl also obtained a temporary restraining order against Wilkerson.

On May 9, 1997, pursuant to Carryl's request, Lawrence was appointed her guardian. On May 21, 1997, Lawrence was accidentally killed. On August 14, 1997, Wilkerson filed his petition for appointment as Carryl's successor guardian. At a hearing held in probate court on August 15, 1997, Inlow's counsel advised the court that Inlow would pay for Carryl's in-home assisted living expenses, and Inlow was appointed Carryl's successor guardian. Thereafter, Wilkerson and Inlow disagreed as to the custody and support of R.W., as well as the disposition of Social Security funds, disability insurance funds and items of personal property. Custody and guardianship proceedings were protracted and acrimonious. A petition for dissolution was filed on April 30, 1998.

Initially, Carryl remained in the marital residence and received in-home assistance. Eventually, she was moved into Inlow's residence. On May 14, 1998, Carryl was taken from Inlow's residence to Methodist Hospital. Inlow's assistant Jamie Martin telephoned R.W. to advise her that Carryl was hospitalized and unconscious. At that time, R.W. was in Wilkerson's custody and a restraining order barred Wilkerson from contact with Carryl. Richard Kiser, Inlow's former director of security, provided Methodist Hospital staff with a copy of the restraining order against Wilkerson. When Wilkerson arrived at Methodist Hospital with R.W. on the following day, a hospital security guard informed him that he would not be allowed in Carryl's room.[1] Wilkerson obtained a court order permitting him to visit with Carryl for one hour, but did not return to the hospital with the order. Carryl died on the evening of May 15, 1998.

Carryl's family did not contact Wilkerson directly to advise him of Carryl's death. The news of her death was relayed from Carryl's brother, Kevin Inlow ("Kevin"), to Wilkerson's sister, to Wilkerson's mother, to Wilkerson. Kevin made the funeral arrangements. Wilkerson learned the details of those arrangements only by calling the funeral home and reading the newspaper obituary.

Wilkerson did not contact Carryl's family members regarding her funeral or interment, nor did he attend Carryl's wake or funeral. On the afternoon of Carryl's funeral, Wilkerson made several unsuccessful attempts to contact Inlow to obtain the key to the marital residence, and thereafter the parties failed to agree concerning the release and disposition of Carryl's assets. On May 21, 1998, Wilkerson filed a petition to probate Carryl's last will and testament. Ultimately, the guardianship

---

1. R.W. declined to enter her mother's hospital room without her father.

accounting proceedings ended with an agreement of the parties.[2]

On February 16, 1999, Wilkerson filed a complaint against Inlow, amended March 4, 1999 and May 12, 1999. Wilkerson sought a declaratory judgment granting him the right to disinter and reinter his deceased wife's remains. He also sought compensatory and punitive damages from Inlow, alleging that she tortiously interfered with his rights to visit Carryl in the hospital and to arrange for Carryl's funeral and burial.

Inlow moved for summary judgment, which the trial court denied. At the conclusion of Wilkerson's case, Inlow moved for a judgment on the evidence, which the trial court also denied. On June 29, 2001, after a four-day trial, the jury awarded Wilkerson compensatory damages in the amount of $3,500.00 on his complaint for wrongful interment, $250,000.00 in compensatory damages on his complaint for intentional infliction of emotional distress and $500,000.00 in punitive damages. No specific declaratory relief was entered.[3] Inlow now appeals.

## Discussion and Decision

### I. Standard of Review

■ We will neither reweigh the evidence nor judge the credibility of witnesses, but will consider only the evidence most favorable to the judgment along with all reasonable inferences which may be drawn from that evidence. *Executive Builders, Inc. v. Trisler*, 741 N.E.2d 351, 359 (Ind.Ct.App.2000), *trans. denied, cert. denied*, ── U.S. ──, 122 S.Ct. 814, 151 L.Ed.2d 698 (2002). This Court indulges in every reasonable presumption in favor of the legality of the jury's verdict and will reverse on grounds of insufficient evidence only where the evidence points to a single conclusion different from the judgment. *Id.*

### II. Wrongful Interment

■ Inlow claims that the $3,500.00 judgment on Wilkerson's statutory claim for damages for wrongful interment is not supported by sufficient evidence. We agree.

Indiana Code section 25–15–9–18 lists persons having authority to determine the final disposition and interment of human remains, with priority given to the decedent's surviving spouse. Indiana Code section 23–14–55–1 provides as follows:

An individual who signs an authorization for the interment, entombment, or inurnment of any human remains:

(1) is considered to warrant the truthfulness of:

(A) any fact set forth in the authorization;

(B) the identity of the person for whose remains interment, entombment, or inurnment is sought; and

(C) the individual's authority to order the interment, entombment, or inurnment; and

(2) is personally and individually liable to pay damages in compensation for harm that:

(A) is caused by; or

(B) results from;

---

**2.** Pursuant to the agreement of the parties, Wilkerson received the guardianship checking account, Inlow withdrew her demand that Wilkerson pay $3,000.00 in delinquent child support to Carryl's estate, and Inlow paid Carryl's funeral expenses without reimbursement from estate funds.

**3.** However, the parties have apparently agreed that a court order directing the Indiana State Department of Health to issue a disinterment order for removal of Carryl's remains from the Inlow crypt is appropriate.

the signing of the authorization for interment, entombment, or inurnment.

Thus, Wilkerson was required to establish that Inlow (1) signed an authorization for Carryl's interment which authorization (2) caused (3) harm to Wilkerson.

The pertinent facts surrounding Carryl's final arrangements are uncontroverted. Kevin made the final arrangements. (Ex. 1–C.) Inlow signed a contract obligating her to pay Leppert & Hensley Mortuary for Carryl's funeral services. (Ex. 3.) Inlow's employee affixed his signature to an uncaptioned document, which was treated by Catholic Cemeteries Association personnel as authorization for the placement of Carryl's body next to Lawrence in the family crypt. (Ex. 1–B.) Assuming that the two documents collectively comprise an "authorization" by Inlow to inter Carryl's remains, we nevertheless conclude that Wilkerson failed to establish that the authorization resulted in the harm contemplated by Indiana Code section 23–14–55–1.

■ Courts will reject an interpretation of a statute that produces an absurd result. *In re Visitation of J.P.H.,* 709 N.E.2d 44, 46 (Ind.Ct.App.1999). Although Indiana Code section 23–14–55–1 and Indiana Code section 25–15–9–18 are silent concerning the effect of a dissolution petition or restraining orders on spousal priority to inter remains, the legislature could not, as a reasonable body, have intended that a decedent's surviving guardian and family members are required to withhold consent to inter remains upon peril of paying statutory damages to an estranged spouse who does not timely assert his affirmative right, if any, to inter remains.

Wilkerson did not attempt to exercise any right to make final arrangements for Carryl or to inter her remains. According to his testimony, when Wilkerson first learned of Carryl's death, he was also aware that "they [Carryl's family] were going to handle arrangements." (Tr. 482.) He acknowledged that he placed no calls to the hospital during Carryl's final hospitalization, and that he lodged his initial objection to Carryl's interment in the Inlow family crypt one week after her funeral. Having failed to exercise any right to determine Carryl's final arrangements or inter her remains, Wilkerson admittedly suffered no economic damages. Ultimately, rather than suffering economic harm, Wilkerson was relieved of the burden of paying for his estranged wife's funeral and interment. His retrospective contention that he "would have" made other arrangements does not constitute the type of compensable harm contemplated by Indiana Code section 23–14–55–1.

### III.  Intentional Infliction of Emotional Distress

■ "One who by extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to another is subject to liability for such emotional distress." *Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind.1991) (adopting the Restatement (Second) of Torts § 46 (1965)). The elements of the tort are: a defendant (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. *Branham v. Celadon Trucking Services, Inc.,* 744 N.E.2d 514, 523 (Ind.Ct. App.2001), *trans. denied.* "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (quoting the comment to Section 46 of the Restatement (Second) of Torts).

■ Here, the evidence fails to establish that Inlow engaged in extreme and outrageous conduct. The jury heard substantial evidence concerning the actions of the parties during the guardianship and separation proceedings. However, as of the time of the jury trial, the guardianship and separation proceedings were terminated. The allegations concerning Wilkerson's exclusion from the hospital room pursuant to the restraining order were considered by the trial court to be *res judicata*, having been settled in the guardianship proceedings, and the jury was instructed accordingly.[4] Wilkerson conceded that his claims at trial were limited to his allegations that Inlow precluded him from attending the funeral and wrongfully authorized Carryl's interment.

■ It is uncontroverted that Wilkerson did not attend Carryl's funeral. However, the evidence most favorable to Wilkerson's intentional infliction of emotional distress claim does not disclose any affirmative conduct by Inlow excluding Wilkerson from Carryl's funeral. Rather, the evidence indicates that Wilkerson anticipated his exclusion from Carryl's funeral, had he attempted to attend. Wilkerson explained his decision not to attend Carryl's funeral as follows:

A: Because of the past acts of hostility directed towards me, I didn't feel safe to go there, and I was concerned for my daughter's safety also.

(Tr. 433.)

A: I feared that had I made an appearance there I would've been arrested, she would've contrived some excuse to have me arrested and put in jail, and then she would've tried to take my daughter.

Q: Did [R.W.] go to her mom's funeral?

A: Yes. She went with my sister, Nancy, who was her Aunt.

(Tr. 434–35.)

Q: Now, prior to the funeral, no one told you that you could not attend the funeral, or that you wouldn't be welcome there?

A: I knew I wouldn't be welcome there.

Q: I'm asking you if anyone told you that?

A: No one told me that.

Q: No one told you that you'd be barred from attending the funeral if you came, did they?

A: No one told me that either.

Q: Now, it is true that your reason for not going to the funeral is that you believed in your own mind that you would not be welcome and you thought it was best for all parties that you did not attend?

A: I though it was best for my own personal welfare and my daughter's.

(Tr. 485.)

A: That's fine. I know they had security people there, I don't know the names, what they looked like. I thought it was better for all parties concerned if I didn't even go.

Q: And that was not go to the funeral, you thought it was better for all parties

4. Court's Final Instruction 11 provided as follows: "You must decide the issue of intentional infliction of emotional distress according to the Indiana law of comparative fault. The term 'fault' refers to conduct that makes a person responsible, in some degree, for injury. The types of fault at issue are:

(1) Anita Inlow's alleged intentional infliction of emotional distress by causing Michael Wilkerson to be precluded from arranging or attending the funeral of Carryl Wilkerson;

(2) Michael Wilkerson's failure to mitigate damages in this regard."

(Appellant's Appendix 17.)

that you not go to the funeral, isn't that correct?

A: That's what I said.

Q: Yes. Do you still believe that?

A: Well, it was definitely true for my daughter and myself. Those were my main concerns.

Q: Well, it is true then that Anita Inlow took no action to preclude you from attending the funeral, isn't that correct?

A: I suppose so.

Q: Can you please tell the jury then what is the basis for your claim that she intentionally inflicted emotional distress upon you by barring you from attending the funeral?

A: The basis to my claim is Mrs. Inlow sanctioned [sic] the courts was that when life support was terminated she was supposed to get out of our lives, go back to where she came from and stay there. She refused to do that. She couldn't let go of the power, the control she had over my daughter, my wife and myself. She had to play her game through to the end. That's the basis.

. . .

Q: I guess, Mr. Wilkerson, you do agree there was no action that Anita Inlow actually took, any affirmative action that she took that precluded you from attending the funeral?

A: Like did she point her finger at me and say not go?

Q: Right.

A: A direct action?

Q: Yes.

A: I suppose not, but it was her direct action to do what she did with my wife's body, give all the orders and have her people conduct these various things, she directed everything.

(Tr. 487–89.) Although Wilkerson anticipated ejectment or arrest had he elected to attend Carryl's funeral, he did not in fact attempt to do so. His testimony as to expectable conduct by Inlow upon his appearance at the funeral is merely speculative. To establish a claim of intentional infliction of emotional distress, affirmative conduct is required, of an outrageous and extreme nature, beyond that which is merely unreasonable. *Gable v. Curtis,* 673 N.E.2d 805, 810 (Ind.Ct.App.1996).

The evidence does establish affirmative conduct by Inlow in regard to Carryl's final arrangements and interment. Inlow signed a contract obligating her to pay for Carryl's funeral. Moreover, it may be inferred from the evidence that Inlow acquiesced in the placement of Carryl's body beside Lawrence in the family crypt. Nevertheless, these are not the type of actions "beyond all possible bounds of decency, regarded as atrocious, and utterly intolerable in a civilized community, such that an average member of the community would exclaim 'Outrageous.'" Restatement (Second) of Torts § 46, cmt. d.

Accordingly, Wilkerson failed to present sufficient evidence to establish each requisite element of his intentional infliction of emotional distress claim.

### IV. Punitive Damages

#### A. Standard of Review

■ The standard of review for punitive damages is whether, considering only the probative evidence and the reasonable inferences supporting the judgment, a reasonable trier of fact could find by clear and convincing evidence that the defendant acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing. *Executive Builders, Inc.,* 741 N.E.2d at 360.

#### B. Analysis

■ Inlow claims that the $500,000.00 award of punitive damages cannot stand

because there was a lack of evidence that she committed an action against Wilkerson that was malicious, oppressive and intentional. Again, we agree.

Wilkerson testified that he was deprived of the right to have closure with regard to Carryl's funeral and burial and was therefore entitled to an award of "as much as he could get" to cause Inlow "to suffer financially the way she made him suffer." (Tr. 449-51.) However, Wilkerson's claim for punitive damages suffers from the same infirmity as his tort claim for intentional infliction of emotional distress. He did not present evidence of specific conduct by Inlow that deprived him of the opportunity to participate in Carryl's funeral and burial. His speculation, and the speculation of Inlow's son, regarding what might have happened had Wilkerson arrived at Carryl's funeral, does not establish by clear and convincing evidence that Inlow acted with malice, fraud, gross negligence or oppressiveness.

### Conclusion

Wilkerson failed to establish the essential elements of his claims for wrongful interment, intentional infliction of emotional distress and punitive damages. Accordingly, the judgments are reversed.

Reversed.

NAJAM, J., and ROBB, J., concur.

#### ORDER

This Court having heretofore handed down its opinion in this case on May 17, 2002, marked Memorandum Decision, Not for Publication;

Comes now the Appellee, by counsel, and files herein his Motion to Publish Memorandum Decision, alleging therein that said decision interpreting I.C. 25-15-9-18 addresses an issue of first impression in Indiana; that the statute has not previously been interpreted by any appellate decision in Indiana and therefore said Memorandum Decision should be published and prays this Court to publish said Memorandum Decision.

The Court having examined said Motion, noting that no response has been filed, after having reviewed its opinion in this case and being duly advised, now finds that said Motion should be granted and that this Court's opinion in this appeal heretofore handed down as a Memorandum Decision should now be ordered published.

IT IS THEREFORE ORDERED as follows:

1. The Appellee's Motion to Publish Memorandum Decision is granted and this Court's opinion heretofore handed down in this appeal on May 17, 2002, marked Memorandum Decision, Not for Publication, is now ordered published.